## JEROME LEROY FLETCHER v. STATE OF MARYLAND

[No. 447, September Term, 1981.]

*Decided December 8, 1981.*

The cause was argued before THOMPSON, LOWE and MASON, JJ.

*Michael R. Malloy, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Alexander L. Cummings, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Joan Lieberman, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

Upon conviction by a jury in the Circuit Court for Prince George's County of felony and misdemeanor theft, appellant was sentenced to ten years imprisonment. The items taken were a car door, a gas tank and a 1961 Volkswagen automobile.

The owner of the stolen items testified that he had kept four cars behind an abandoned house on an acre of posted land owned by him. While routinely checking the property he came upon a pickup truck with one of his gas tanks in it, parked near his Volkswagen, which had been pulled a few feet by a chain still attached. The pickup truck was occupied by one Richard James and the infant daughter of appellant.

When accosted, James claimed that he had been hired by appellant to move the vehicle and soon after produced appellant, whose automobile contained a door missing from one of the other seemingly abandoned vehicles. Although the owner testified that he had given no one permission to asport his vehicles or parts thereof, James claimed that appellant and another man had offered him fifty dollars to move the Volkswagen (and some other articles which appellant said had been given him) to a junk yard.

Replying to an attack on his reason for testifying against his friend, James testified under cross-examination that he had been charged in the case, denied having made any deal with the State, and had been tried. He was asked if he had been promised a "lesser sentence" to testify against appellant. His reply was not responsive.

"I had no defense. The only defense I had was to tell the Court exactly what happened."

He was again asked whether the State had agreed "to offer you any", presumably meaning leniency. He responded:

"Didn't promise me nothing."

Counsel pressed on, obviously inquiring whether his sentence was pending, from which he might expect the leniency he had not been overtly promised.

"Q   Did you get a sentence?
MISS LIEBERMAN [prosecutor]: Objection.
THE COURT: Objection sustained.
THE WITNESS: Answer the question?
THE COURT: No.
BY MR. PARKER [defense counsel]:
Q   When did you go to trial on this?
MISS LIEBERMAN: Objection.
THE COURT: Sustained."

In light of his conviction, and urged on by his own ten year sentence, appellant complains to us that he was denied the right to show bias arising from the witness' possible desire to shift the blame from himself and to obtain sentencing leniency by testifying to aid the State's case against appellant. He relies primarily upon *Davis v. Alaska,* 415 U.S. 308 (1974). Equating James' testimony with that of the witness under attack in *Davis,* it is apparent that both prosecution witnesses provided " 'a crucial link in the proof . . . of petitioner's act' ". *Id.* at 317, quoting *Douglas v. Alabama,* 380 U.S. 415, 419 (1965). It was James' presence and his expressed reason therefor which were necessary to prove

appellant's criminal agency since it was James, not appellant, who was caught in flagrante delicto. The claim of bias which the defense sought to develop was admissible to afford a basis for an inference of undue pressure because of James' vulnerable status pending sentence, as well as of James' possible concern that his presentence investigation might cause him to be considered more culpable than he had asserted by his present and possibly past testimony. *Id.* at 317.

The State's effort is somewhat strained in reply. By steps it tries to build a rationale for the ruling by contending that the question was technically objectionable because it "was not preceded by one asking James what the verdict had been in his case." Therefore, says the State, the precise ruling was not technically incorrect and it did not foreclose further inquiry into the realm of bias.

Perhaps recognizing some persuasive weakness in that contention, the State quickly turns to a harmless error alternative, contending that because appellant's subsequent testimony (as well as a prior statement he had made) was consistent with James' narrative, the cross-examination showing bias would have been a "meaningless exercise". The State attempted at argument to analogize the rule set forth in *Peisner v. State,* 236 Md. 137, 144-145 (1964), that where testimony objected to comes in later without objection from another witness, one cannot successfully claim on appeal that the original error was prejudicial. *See Tichnell v. State,* 287 Md. 695, 716 (1980).

The reasoning of these cases is twofold: 1) a party *waives* his objection to testimony by subsequently offering testimony on the same matter, *Peisner, supra;* and, 2) more pertinently here, when one's own testimony confirms evidence to which he previously objected, no reversible error exists, *Tichnell, supra,* citing *Hillard v. State,* 286 Md. 145 (1979), among others. Significantly in *Hillard* the Court of Appeals recognized an exception to the *Peisner — Tichnell* waiver-harmless error amalgam. If an accused's election to testify was induced by the erroneous admission of the evi-

dence, that he reiterates it will not cure the prior erroneous admission of evidence, *Hillard, supra* at 156.

*Hillard* recognized the vitality of the rule of *Peisner* and its predecessors,

> "that the admission of improper evidence cannot be used as grounds for reversal where the defendant gives testimony on direct examination that establishes the same facts as those to which he objects."
> *Id.*

The Court found it significant, however, that this rule predated an exception carried out by *Harrison v. United States,* 392 U.S. 219 (1968),

> "that a defendant's election to testify will not cure the prior receipt into evidence of an involuntary confession because of the possibility, absent conclusive evidence to the contrary, that his verbal reiteration of this admission at trial was induced by the receipt of his custodial statement." 286 Md. at 156.

Although both *Harrison* and *Hillard* dealt with improperly admitted confessions, the language used by the Court of Appeals spoke more generally of evidentiary or procedural errors which would affect a defendant's election to testify.

> "Thus, the issue becomes 'not whether [Hillard] made a knowing decision to testify but why,' *Harrison v. United States, supra,* 392 U.S. at 223, for as we said in *Dorsey* [*v. State,* 276 Md. 638 (1976)], *supra:* 'An evidentiary or procedural error in a trial is bound, in some fashion, to affect the delicately balanced, decisional process. The abnegation of a particular rule upon which the defense intended to rely may often inflict more damage than initially apparent; . . .' 276 Md. at 657, 350 A.2d at 677." *Id.*

*Harrison,* as pointed out in *Hillard,* was based upon the premise that if a defendant testified in order to overcome the

impact of confessions illegally obtained the testimony was tainted by the same illegality as the initial statements. It was therefore not necessary for the accused to establish that the subsequent testimony was, as a matter of fact, impelled by the use of the inadmissible remarks. The government must show that its illegal action did not induce his testimony. *Hillard, supra* at 157; *Harrison, supra* at 224-225.

> "Although no explicit evidence exists that the defendant Hillard was impelled to testify by the prior introduction of his written confession, neither is there any to the contrary; consequently, the admission of this 'evidentiary bombshell' leaves no doubt in our mind that we must recognize the existence of at least a reasonable possibility that the government's use of his written involuntary confession provoked his verbal testimony at trial and, therefore, destroys any assertion that his in court testimony rendered harmless the erroneous receipt of the earlier statement." *Hillard, supra* at 158.

*Hillard* did not intend the *Harrison* exception broadly to apply in any instance of evidentiary error, so as to abrogate the *Peisner* principle completely, but neither did it confine the exception to erroneously admitted, involuntary confessions.

In this case, as in *Hillard*, without the testimony of the accomplice (James), the case would not have survived a motion for judgment of acquittal. Had James been an acknowledged perjurer, incompetent as a witness, Md. Cts. & Jud. Proc. Code Ann. (1980 Repl. Vol.) § 9-104, the error of admitting his testimony could not have been cured by appellant's subsequent decision to take the stand despite his implicit, if not explicit, verification of James' testimony. James' testimony in such case would have, as a matter of law, had no weight or persuasive effect that a factfinder might consider. Suppression of a perjurer's testimony is a statutory right; however, the right to erode inculpatory testimony by discrediting the witness' credibility is a

constitutional right intended to permit the achievement of the same result. If an accused is satisfied that he had been able to so discredit (or suppress) the one State's witness connecting him to the crime, he need not place himself in further jeopardy by testifying to an excuse, justification or mitigating fact such as appellant did in this case. In either instance the error (if error it was) admitted or protected from attack evidence necessary for conviction, absent subsequent admissions by the accused presumably necessitated by the error. Without a showing by the State that the improper ruling did not induce the testimony we cannot say that the error committed was harmless beyond a reasonable doubt.

The brighter light of hindsight focused upon appellant's subsequent testimony shows the incongruity in our "search for the truth" of permitting its suppression — or even its erosion — during the search. But that is the nature of the adversary system. By placing the burden of proving guilt entirely upon the State, the American judicial process recognizes the right and responsibility of defense counsel to invoke and rely upon, not only procedural roadblocks, but persuasive impediments designed to create a reasonable doubt, without otherwise responding to an accusation. Such reliance can only be assured if the rights to impede are properly permitted.

The constitutionally protected procedure of cross-examination of witnesses against an accused, as an implement to impede, is (when properly used) a crucial weapon in the arsenal of an advocate. When from hindsight it would appear that its use may have undermined the persuasive effect of testimony subsequently substantiated by an accused, we are hard pressed to say that an erroneous preclusion of his right to cross-examine was sufficiently harmful to provide him a second chance to subvert the truth. It is for that reason that we have delved into *Davis, supra,* and similar cases decided both before and since *Davis,* in greater detail than the parties provided us in their briefs to assure that there was error in the first instance. The results of that review convinced us that we must remand for retrial.

Despite appellant's failure to establish his purpose in objecting as clearly as was done by proffer in *State v. DeLawder,* 28 Md. App. 212 (1975), and *Deinhardt v. State,* 29 Md. App. 391 (1975), *cert. denied,* 277 Md. 736, 741 (1976), the error here was made before appellant elected to testify and before the statement was admitted, and must be judged as to its harm potential at that time since had the appellant been able to show bias, he may have elected not to testify at all. Thus the ruling of a trial judge took on added importance. *Cf. Ricketts v. State,* 291 Md. 701, 703 (1981). What a jury may have thought vis-a-vis a contested pretrial statement and a possibly biased witness whose necessary testimony shifted his on-the-scene responsibility entirely to the absent appellant is something upon which we may not speculate.

— *Davis,* before and since —

It is, of course, always permissible for an attorney to seek to elicit, through cross-examination, facts that would directly or inferentially demonstrate that a witness is biased or unworthy of belief. A trial court is under no obligation to protect a witness from being discredited, except to the extent that the witness cannot be compelled to waive privileges such as that against self-incrimination. Md. Const., Decl. of Rts., Art. 22; *Franklin v. State,* 239 Md. 645, 646-649 (1965), or where the witness is being subjected to interrogation intended solely to harass or humiliate him. See *Alford v. United States,* 282 U.S. 687, 694 (1931). Because the concept of liberality in cross-examination is so deeply embedded in the constitutional right of an accused to confront the witnesses against him, *Davis v. Alaska,* 415 U.S. at 315, courts ordinarily allow counsel rather wide latitude with respect to the scope of their interrogations. That rule of liberal latitude is especially applicable where such witness is a codefendant or accomplice of the accused, or is charged with or threatened with criminal prosecution, since his testimony may be influenced by a promise, hope, or expectation of

immunity or leniency with respect to the case as a consideration for testifying against the defendant. *Alford v. United States,* 282 U.S. at 692; Annot., 62 A.L.R.2d 610, 624 (1958).

Yet faced with the realities of the criminal justice system — overcrowded dockets, multiple and often confusing jury questions, personnel shortages, and ever-increasing court costs — the need to place some restrictions on the scope of cross-examination becomes evident.

> "In cases in which the alleged motive of a government witness is hope for prosecutorial leniency there will always be conflict between the need to keep the trial from being sidetracked on collateral issues and the right of the defendant to establish a witness' bias or motive to lie." *United States v. Dorfman,* 470 F.2d 246 (2d Cir. 1972), *cert. dismissed,* 411 U.S. 923 (1973).

It is the trial courts that have been vested with the discretion to strike the proper balance, and absent an abuse of that discretion, this Court will not reverse. *Kruszewski v. Holz,* 265 Md. 434, 440-441 (1972). In this case, however, the inquiry died "abornin". The judge sustained an objection to the very first question which may have led to the revelation that the witness was testifying under the pressure of a pending sentence.

The determination of whether there has been an abuse of discretion necessarily requires consideration of the particular circumstances bearing upon each individual case. Clearly, the absolute preclusion of cross-examination pertaining to a witness's motive for testifying would be an abuse of discretion, but beyond that we must look to such factors as the scope of interrogation permitted, how relevant the particular inquiry is to bias or motive, and whether the defendant has been prejudiced by the court's ruling.

Courts in other jurisdictions that have dealt with similarly circumstanced cases have demonstrated some lack of agreement as to where the line should be drawn between

reversible error and nonabuse of discretion. See, *e.g.*, Annot., 62 A.L.R.2d 610, *supra.* For example, no error was found where defense counsel's questions were cut off before he could inquire of the witness as to whether he had received special considerations with respect to bail and whether the government had helped him to secure employment, *United States v. Mahler,* 363 F.2d 673, 676-678 (2d Cir. 1966); nor was it held to be error to deny permission to inquire into the length of sentence already received by a witness as compared to that imposed on his non-testifying coconspirator. *Hudson v. United States,* 387 F.2d 331 (5th Cir. 1967), U.S. *cert. denied,* 393 U.S. 876 (1968). On the other hand, it has been held that the fact that a witness's sentencing hearing has been postponed until after his appearance may have a bearing on credibility; and refusal to so instruct the jury is error. *Farkas v. United States,* 2 F.2d 644, 647 (6th Cir. 1924). Likewise, a lower court's disallowance of questions relating to sentence has been determined to be grounds for reversal, the Sixth Circuit stating:

> "[The witness's] testimony could well have been guided by his hope of an early parole as a reward for becoming a Government witness against appellant. It is not intended remotely to convey the impression that the United States Attorney might have promised Sanzo a recommendation for parole as a consideration for his testimony. *Mere hope upon the part of Sanzo that he would be so rewarded would supply sufficient motive for his* testimony against Dr. Spaeth." *Spaeth v. United States,* 232 F. 2d 776, 779 (6th Cir. 1956), (emphasis added).

In a recent Fourth Circuit case, the court found grounds for reversal where the trial court prohibited defendants from attacking the credibility of two important prosecution witnesses on cross-examination by showing possible bias or incentive to support the prosecution's case. *Chavis v. North Carolina,* 637 F.2d 213 (1980); *Accord, United States v. Crumley,* 565 F.2d 945 (5th Cir. 1978).

As these cases suggest, the crux of the inquiry insofar as its relevance is concerned, is the witness's state of mind. What is essential to the preservation of the right to cross-examine is that the interrogator be permitted to probe into whether the witness is acting under a hope or belief of leniency or reward. As the Court in *Greene v. Wainwright,* 634 F.2d 272 (5th Cir. 1981), stated at 276:

> "What counts is whether the witness may be shading his testimony in an effort to please the prosecution. 'A desire to cooperate may be formed beneath the conscious level, in a manner not apparent even to the witness, but such a subtle desire to assist the state nevertheless may cloud perception.' *Burr v. Sullivan,* 618 F.2d 583, 587 (9th Cir. 1980). See *United States v. Onori,* 535 F.2d 938, 945 (5th Cir. 1976)."

From this standpoint, what sentence a witness received may or may not be a relevant inquiry; under the circumstances of the case sub judice, however, we believe not only that such a line of inquiry was relevant, but that the court's refusal to permit it constituted reversible error.

It is easy to see how the witness could have concluded logically that his failure to testify as he had promised or as was expected of him might have adverse consequences. As indicated in appellant's brief, if given the opportunity, the jury may have believed that the witness feared that his sentence was dependent upon appellant's conviction. It matters not whether such fear was reasonable, if he in fact believed that such was a possibility, see *Farkas,* 2 F.2d at 647, or more particularly, that the jury believed that to have been his state of mind. We are unable to say that a jury might not have inferred from answers to sentencing inquiries that the witness was testifying at the trial based on the hope of retaining a favorable reception from an understanding judge at subsequent sentencing (or even a favorable reconsideration if within the permissible time as determinable from an answer), and was accordingly less than truthful.

Citing *Robinson v. State,* 47 Md. App. 558, 572-573 (1981), the State inferentially maintains that cross-examination was not unduly restricted since the appellant could have continued questioning the witness despite the sustained objection. But appellant did attempt to do just that. After the court sustained the State's objection to inquiry on whether the witness had been sentenced, appellant asked the witness when he had been tried for his part in the crime, and even that effort was foreclosed by a sustained objection without inquiry by the court as to the purpose sought to be elicited. This would indicate to a reticent counsel that the subject was closed. While we are of the opinion that appellant could have more thoroughly elucidated for the lower court his reasons for wanting to pursue the matter of sentencing, and even from an advocacy posture should have been more persistent in pressing the issue, it is difficult to conceive how appellant could have shown the witness's apprehension of a hammer hanging over his head, without first establishing his proximity to that real or imagined maul. It cannot be shown that a sentencing is pending if a witness need not answer *whether* he has been sentenced, and if so, when. The fear of a pending sentence or reconsideration might have been a state of mind flowing from his degree of participation in the case itself, and the motivating fear could not otherwise be properly established unless the danger was shown to be apparent. Where, as here, the credibility of the witness whose testimony is sought to be undermined is so crucial to conviction, we are constrained to hold that the court's error in curtailing cross-examination is not harmless.

In *Dorsey v. State,* 276 Md. 638, 659 (1976), the Court of Appeals set forth the criteria to be applied in determining whether trial error was harmless:

"We conclude that when an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and

a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of — whether erroneously admitted or excluded — may have contributed to the rendition of the guilty verdict."

Applying this test to the facts in this case it is apparent that we are not persuaded by our independent review, beyond a reasonable doubt, that the restriction on cross-examination was harmless. Just as we cannot speculate upon why or how a jury arrived at a verdict, *Dunn v. United States,* 284 U.S. 390, 394 (1932); *Ford v. State,* 274 Md. 546, 550-553 (1975), neither can we speculate on what might have occurred had admissible, impugning cross-examination been received to attack the crucial witness, without whose testimony there was no case. We may even prophesy that the result would not be varied, but we cannot so state "beyond a reasonable doubt".

— jury instructions —

Appellant also contends that he was denied the right to *any* final jury instructions and that the evidence was insufficient to prove that the value of the vehicle stolen was *over* Three Hundred Dollars. Because appellant failed to request instructions, pursuant to Md. Rule 757, or object to the failure to instruct, we will not address his former contention, Md. Rule 1085, despite his present use of the constitutional phrase "due process" in presenting it here for the first time. *Vuitch v. State,* 10 Md.App. 389, 397-398 (1970), *cert. denied,* 261 Md. 729, U.S. *cert. denied,* 404 U.S. 868 (1971).

— value —

Regarding his sufficiency argument we note that the victim testified — under the tutelage of the court — as follows:

"Q    What was the approximate value of the vehicle?

A   Well, last night I looked.

THE COURT: Just tell us.

THE WITNESS: 1961 Volkswagen in the condition that it was with a sunvisor roof, which is a more expensive model — at first I thought when I asked this question once before. I thought the value of it was $300; however, in checking out the value of this type of a car, if I had to replace it, it would cost me—

MR. PARKER: I object, Your Honor."

Pedantically, the court admonished:

"See there, you didn't do what I told you. You have to learn about testifying. The shortest way is the best way. Tell her in dollars.

THE WITNESS: $750."

The Maryland Code provides that felony theft is when the property stolen has a value of Three Hundred Dollars *or greater.* Md. Ann. Code (1957, 1976 Repl. Vol. & 1981 Supp.) Art. 27, § 342 (f) (1). Appellant mistakenly assumed that the statute required the value to be *more* than Three Hundred Dollars. The testimony established the necessary valuation to sustain felony theft implicitly as a market value of Three Hundred Dollars and replacement value as Seven Hundred Fifty Dollars. Either would have sufficed under Art. 27, § 340 (1). The case may be retried.

> *Judgment reversed.*
> *Case remanded for retrial.*
> *Costs not reallocated.*
> *Md. Rule 1082f.*